**H&H, INC., SEONG LIM HEO and WILLIAM M. STEFFANY,**
**Plaintiffs,**

**v.**

**SAMOA ENTERPRISES, INC., and HEUNG MAN LIM,**
**Defendants.**

High Court of American Samoa
Trial Division

CA No. 93-03

September 26, 2005

Before KRUSE, Chief Justice; and ATIULAGI, Associate Judge.

Counsel: For Plaintiffs, Robert K. Maez
For Defendants, Jeffery Waller

OPINION AND ORDER

## Introduction

Plaintiff Seong Lim Heo ("Heo"), a resident alien of American Samoa and Korean national, first arrived in American Samoa while serving as an engineer on a refrigeration cargo ship in 1999. Heo subsequently returned to the Territory in December 2002, with the purpose of establishing a refrigeration business. He sought out the defendant Heung Man Lim ("Lim"), manager/owner of defendant Samoa Enterprises, Inc. ("Samoa Enterprises"), as Heo had somehow learned that Lim, with the reputation of being the local "godfather" amongst the Korean community in American Samoa, was the person with influence to talk to about setting up business in the Territory.

Lim offered Heo his assistance, but he in turn requested Heo to modify the "ice system" of three fishing vessels, *Pago 1*, *Pago 2*, and *Pago 3*, which were owned and operated by Samoa Enterprises. Moreover, Lim told Heo to do the modification work within a budget of approximately $15,000.00 to $20,000.00 per vessel. Even though Lim's budget ceiling was grossly inadequate for the requisite modification work, Heo nonetheless accepted Lim's instructions and undertook the work accordingly. According to Heo, he felt compelled to do as he was told, since he was relying on Lim's knowledge of the licensing and administrative procedures in the territory; his ability to assist him with his immigration status; as well as his apparent political and economic influence in both the Korean and Samoan communities. As the

newcomer, Heo said he felt intimidated by Lim, and, regarding Lim as an authority figure, did not feel it appropriate to ask Lim to formalize any terms of their business arrangements in a written document.

Subsequent to these discussions, Lim, apparently true to his perceived reputation, managed to handily navigate regulatory red tape placing restrictions on an alien setting up business in the Territory and quickly secured Heo not only a P5 immigration status, but a business license as well to facilitate Heo's intended business activities. Lim accomplished all this with the aid of Toa Krone, an American Samoan resident who essentially testified that she used her name, at Lim's behest, to front a business under the name of "Ocean Industries Enterprises," that she had nothing further to do with subsequently. Moreover, Heo was told that Lim had also arranged an immigration sponsor for him, the wife of the then Attorney General.

Between March 2003 through May 2003, Heo performed labor and repairs to convert the ice system on the defendants' three fishing vessels into a refrigeration system. Between February 2003 through September 2003 Heo additionally performed freezer repair services on equipment at Nu`uuli Mart, another business owned by Samoa Enterprises, at Lim's direction.

On November 4, 2003, plaintiffs Heo, H&H Inc., a new corporate structure under which Heo now does business, and plaintiff William M. Steffany, described in the complaint as Vice-President of H&H, filed suit against the defendants, which at the outset named the Attorney General as well as a senior immigration officer who have since been dropped from the suit. The complaint alleges non-payment for parts and services rendered on the fishing vessels and at Nu`uuli Mart. Plaintiffs seek damages of $53,303.20, being the amount invoiced for the parts and labor provided, together with interest.

On November 18, 2003, defendants answered the complaint and asserted a counterclaim. While admitting that Lim had authorized Heo to perform labor and repairs on the vessels and at the store, defendants allege that Heo's work was not performed in a workmanlike manner, resulting in damages to the vessels leading to losses of catch. Defendants similarly maintain that Heo's repairs at Nu`uuli Mart caused damage to shop freezers and ice machines, and that as a result of such damage, defendants were compelled to order further repairs. Defendants claim that as a result of Heo's said failures, no compensation is due him, but that they are entitled to $100,000 being the costs and repair of freezer equipment, as well as actual and consequential damages arising from rejected fish catch.

Having considered the parties' submissions, and evidence presented at trial, we conclude that Heo has made a sufficient claim in equity and that he is entitled to *quantum meruit* relief. On the other hand, we find and conclude that defendants' counterclaim is entirely without merit.

## Discussion

We note at the outset that we view and treat plaintiff's cause as one in *quantum meruit*, as opposed to one in contract. Defendants emphasize that plaintiffs cannot assert a cause of action in contract because H & H, Inc. is not a properly incorporated business and that Heo has no individual or personal contract with Samoa Enterprises.

We first observe that defendants' assertion takes a narrow reading of the complaint. In detailing the work completed by Heo, plaintiffs request damages equaling the value of the work he performed, but do not specifically limit their theory of recovery to contract, equity, or otherwise. In turn, neither do we limit our review to theories of contractual recovery.

■ Additionally, we agree with defendants that we are unsure whether plaintiff H&H has performed the necessary formalities to obtain recognized status as a corporate entity, whether a contract was actually formed between defendants or plaintiffs, or if formed, what the true meeting of the minds between the parties may have been. Nevertheless, we feel confident that given the informal business arrangements and the relationship between the parties, we may in the alternative consider whether plaintiffs are entitled to relief under equitable principles of *quantum meruit* in the absence of such a contract, asking us to determine whether there has been "performance of services by the plaintiff, the receipt of the benefit of those services by the defendant, and the unjustness of the defendant's retention of that benefit without compensating the plaintiff." *Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 737 (7th Cir. 1990)(internal citations omitted).

■ Therefore, by recognizing that a "claim in quasi-contract is established when the defendant has unjustly retained a benefit to the plaintiff's detriment, and defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience," we reason that in the absence of firm evidence of a contractual relationship, we may appropriately review plaintiffs' complaint under principles of equity. *Id.*

## I. The Fishing Vessels

We begin by addressing the contention raised in defendants' counterclaim that Heo did not provide a service. Defendants do not dispute that between March 20, 2003, through April 30, 2003, Heo installed compressor units and evaporators for the *Pago 1*, *Pago 2*, and *Pago 3* fishing vessels, and that in May of that year Heo further performed repairs on the compressor units for each vessel. Defendants, assert, however, that Heo failed to install and repair the equipment in a workmanlike manner, and that as a result of such alleged failure defendants suffered economic losses from increased rejection of fish catches and associated maintenance costs.

First, we are not convinced that defendants' catch had suffered increased losses as a result of Heo's services. Neither plaintiffs nor defendants disputed the testimony of Starkist's Fish Coordination Department head, Bruce Leiataua ("Leiataua"), nor Starkist's business records relating to *Pago 1*, *2*, and *3* fish catch information about which Leiataua testified. Leiataua noted that Starkist records both the total amount of a catch offered for sale, as well as the proportion of that catch that is rejected by Starkist. Further, he described that Starkist may reject fish for numerous reasons including high histamine levels and "sour gill," caused by exposure to high temperature; discoloration, caused by mishandling or lack of ice; "honeycomb," caused by mishandling or high temperature; or bruising.

Turning to the data of fishing Vessel *Pago 1*, found in Exhibit 1, the figures do not clearly substantiate defendant's claim that a greater increase in rejection of catch occurred after Heo's installation. The data, listing the total amount of fish caught, as well as the percentage of fish rejected in each catch, shows that between June 6, 2001, up until the installation of equipment, there were 44 fish catches in which sales were made to Starkist. Of those 44 trips, 17 trips reported no rejected fish. Two trips, one on November 2, 2002, and the other on January 29, 2003, reported 100% rejected fish. Overall, prior to the installation of the new refrigeration equipment, 8.97 tons of fish were rejected out of a total of 159.81 tons, a 5.61% rejection rate.

After installation, we note a record of 17 fish catches in which sales were made to Starkist following Heo's services. Of those 17 trips, 6 trips reported no rejected fish. We have a discrepancy in Starkist data, however, involving the November 12, 2003 catch. Starkist summary records indicate that no fish were rejected in this catch and that the net value of the fish was $12,268.17. The individual record of this trip indicates, however, that the entire load of fish was rejected for "honeycomb." This leaves us with two possible measures. If the catch

239

was rejected, we find that subsequent to Heo's installation, 7.68 tons of fish were rejected out of a total of 70.73 tons, a 10.8% rejection rate. If, however, we follow the summary records, only 1.78 tons of fish were rejected out of 70.73 tons, a 2.5% rate of rejection B a rate less than that prior to installation.

As fishing vessel *Pago 2* sunk on first trip out, the fishing data for the *Pago 2* vessel ends in January 2003, leaving us with no effective comparison. Nevertheless, for the *Pago 3* fishing vessel, we find only minor differences in catch. The data, listing the total amount of fish caught, as well as the percentage of fish rejected in each catch, shows that between August 7, 2001, up until the installation of equipment, there were 44 fish catches in which sales were made to Starkist. Of those 44 trips, 19 trips reported no rejected fish. Three trips, on November 4, 2001, December 8, 2001, and December 19, 2001, reported 100% rejected fish. Overall, prior to the installation of the new refrigeration equipment, 19 tons of fish were rejected out of a total of 138.87 tons, a 1.36% rejection rate.

After Heo's services, we have a record of 17 fish catches in which sales were made to Starkist. Of those 17 trips, 4 trips reported no rejected fish, and no trips were 100% rejected. Overall, after Heo installed the equipment, 2.39 tons of fish were rejected out of a total of 66.23 tons, a 3.6% rejection rate. While we observe that a 3.6% rejection rate is indeed higher than the rate prior to installation, we note that it is also lower than that of the *Pago 1* vessel prior to installation, and that when asked, Leiataua testified that although the Pago vessels had rejects after March 2003, these rates of rejection were not high.

Even were we to find that the Starkist data indicates a negative pattern with regard to defendant's catch levels, we are not convinced that this is entirely attributable to Heo's workmanship. For example, accepting for the moment that the November 12, 2003, catch on *Pago 1* was fully rejected, we note that the rejection was based on "honeycomb," which is apparently caused by mishandling and high temperature. Although defendants suggest that any problems with high temperatures are necessarily linked to Heo's allegedly faulty refrigeration system, other factors are at play here. Seung Jai Lim ("Jai"), the son of defendant Lim, testified that out of concern for the condition of the catch on arrival, he and others would unload the catch into a van in Pago Pago, transport the fish to Nu'u'uli, a drive of approximately 30 minutes, place the fish in a refrigerated shipping container, and then return the fish, once frozen, to Pago Pago for sale at the tuna canneries. We think it fair to reason that if any temperature related injury existed in the fish at the time of the arrival, efforts to subsequently freeze the fish would not erase that pre-existing damage. In turn, we hold, that given the practice of transporting

the fish post-arrival, any damages to the fish resulting from mishandling and high temperature could just as well be explained by Jai's conduct as Heo's installation. Given that the overall fish catch was substantially similar both before and after Heo's installation, we conclude that defendants have not experienced a significant variation in catch rejection to constitute a cognizable injury.

Having concluded that the vessels could capably catch fish after Heo's installation, we further explore whether Heo conferred a benefit on defendants that warrants compensation. In other words, whether defendants would be unjustly enriched if we choose not to award Heo compensatory damages. First, neither parties dispute, and we acknowledge, that Heo did not install a premium refrigeration system. Heo testified that when approached by Lim to convert the ice systems into a refrigeration system, he estimated that such conversion would require approximately $30,000 per vessel. Lim, however, rejected this figure offering instead a lower budget in the range of $15,000 per vessel, an amount which is reflected by Heo's eventual installation price of $14,624.40 per vessel.

In addition, Heo testified that while in his professional opinion, he felt that certain refrigeration equipment should be installed in the engine rooms and on the lower side of the vessels, Lim insisted that it be put in different locations, notwithstanding Heo's insistence that this might eventually cause technical problems. Finally, Heo maintained, that after making his installations, he left necessary instructions regarding the proper management and maintenance of the equipment, in light of its unusual installation, but that subsequent to installation, crewmen and others did not follow his directions.

Defendants offer the testimony of Terry Conden, a marine consultant, who stated that in his opinion, the refrigeration system was not installed with good marine practice and that the coiling system was not spaced close enough. Yet, while we accept Conden's testimony that the spacing of the coils may have been greater than that which he was accustomed to, Conden clearly stated that he was unaware of the industry standard for spacing and that he could only "guess" that the spacing should be uniform.

In light of the record, then, we have no hesitation in concluding that the refrigeration system on the vessels was not first-class, but, after noting that defendants were able to sell over 126 tons of fish to Starkist after Heo's services, neither are we willing to hold that it was substandard. To the extent that defendants assert that Heo installed an "improper" refrigeration system, and criticizes Heo's installation methods, we reason, quite simply, that defendants are largely to blame. Had defendants been

willing to provide Heo with a larger budget and given Heo the full liberty to install the equipment in the professional manner which he deemed appropriate, defendants would no doubt have had fewer refrigeration problems. Yet, where a person pays for a Chevrolet, they have no right to expect a Cadillac, and neither should Heo be held to a higher standard than that of which he was capable under the circumstances.

Likewise, that defendants had to replace the equipment is not wholly attributable to Heo's installation. To the extent that the parties had an agreement that Heo install the equipment, Heo had notified others on how to manage and maintain it. That defendants have not credibly countered Heo's testimony that the equipment was not properly maintained after installation, we conclude that any eventual repairs or replacement were exacerbated in part by defendants' day-to-day management of it.

Therefore, although Heo's service may not have been trouble-free, it was nevertheless a benefit obtained and deserves *quantum meruit* relief. In fashioning such a remedy in this case, defendants confuse the measure of damages in *quantum meruit* and restitution claiming they are identical theories of recovery. We note, as did the Ninth Circuit in *CDM Mfg. Co., Inc. v. Complete Sales Representation, Inc.*, that "in unjust enrichment, damages are conferred in the amount the defendant benefited; in *quantum meruit*, damages are the measure of the value of the plaintiff's services." 50 Fed.Appx. 348, 350 (9th Cir. 2002). Were we to award solely restitutionary damages, we would have to refuse Heo any compensation for work done on *Pago 2*, because after it sunk, defendants could not reap any benefits from the vessel, and therefore not be "unjustly enriched" by failing to pay Heo for his work. Because, here, we are attempting to compensate a person who has rendered services in a quasi-contractual relationship, the appropriate measure of damages is the reasonable value of those services. *See Zuguin v. M/V Captain M.J. Souza*, 23 A.S.R.2d 7, 10 (Trial Div. 1992) (a seaman who prepared a vessel for an upcoming voyage was entitled to *quantum meruit* compensation at the reasonable market rate for his services); *see also Chodos v. West Publishing Co., Inc.*, 92 Fed.Appx. 471, 473 (9th Cir. 2004)("the measure of recovery in *quantum meruit* is the reasonable value of the services rendered, provided they were of direct benefit to the defendant."); *see also* BLACK'S LAW DICTIONARY 1276 (8th ed. 2004). Consequently, with regard to the fishing vessels *Pago 1*, *Pago 2*, and *Pago 3*, then, we find it appropriate to award Heo $14,624.40 for labor and installation of the compressor and evaporator on each fishing vessel, $2,180.00 for labor on the compressor unit of *Pago 1*, $2,180.00 for labor on *Pago 2*, and $1,580.00 for labor on *Pago 3* B a total of $49,813.20 as reflected in Heo's billing statements.

## II. Nu`uuli Mart

After reviewing the record and testimony, we likewise find and conclude with regard to Heo's services at Nu`uuli Mart. Heo's invoices show that on February 11 and 19, 2003, April 17 and April 20, 2003, May 7, 12, and 21, 2003, June 10, 2003, and September 21, 2003, Heo performed repair work for defendants on the walk-in freezer, open freezer and ice machine located at Nu`u`uli Mart; and that subsequent to Heo's work, defendants hired a third-party or parties for continued repairs.

Defendants contends that the fact that Heo had to repeatedly repair the equipment, and that someone else had to be hired after Heo to continue with repairs, suggests that Heo's work was of little value. We disagree. We reason, as plaintiffs argue, that if defendants had found Heo's work unsatisfactory, they would not have welcomed him nine times to engage in repairs. Indeed, that defendants maintain that they paid Heo "on the spot" for all work performed on the freezers lends support to the view that they repeatedly believed they were being benefited by Heo's labor. We do not read much into the fact that defendants hired someone else to repair the freezers after Heo. While defendants imply that we should read into this the view that the new repairperson was necessary to make up for any repair flaws caused by Heo, we find it more likely that, given defendants' repeated hiring of Heo, the freezers were in frequent need of ongoing repairs, and that defendants would have had to seek labor no matter who the source. We therefore conclude, as with the fishing vessels, that by repeatedly conferring a service on defendants, Heo is entitled to receive reasonable compensation for his services.

In deciding the value of such compensation, we again observe that Jai testified, contradicting Heo's testimony, that such compensation was already given to Heo in the form of cash payments. In resolving this contradiction in testimony, we find Heo's account of events more credible. Jai stated that he paid Heo in cash on the spot from the register. At the same time, however, Jai insisted that records of all payments were appropriately kept for tax reporting purposes and to ensure that no employees stole money from the register. Yet, given Jai's insistence that all records were kept, but that in this case there are no payment records available, we find Heo's assertion more believable that no such payments were ever made.

Because Heo performed a beneficial service which defendants have retained, we award Heo $3,490.00, the reasonable value of parts, material, and labor for his work at Nu`u`uli Mart, as reflected in his invoice.

## Order

Upon the foregoing, judgment will accordingly enter in favor plaintiff Heo against the defendants in the sum of $53,303.20. It is so ordered.